Pennsylvania Railroad Co. *v.* Pennsylvania-Ohio
Electric Co., Appellant.

Argued January 21, 1929. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Douglass D. Storey,* with him *C. H. Akens* and *Hause, Evans & Baker,* for appellant.—The lower court erred in its construction of the contract: Bratten v. R. R., 211 Pa. 21; Swarthmore Boro. v. P. S. Co., 277 Pa. 472; Penna. R. R. v. Ry., 176 Pa. 559; Howe v. Crawford Co., 47 Pa. 361; Cunningham v. Baptist Church, 159 Pa. 620.

The lower court erred in refusing appellant its legislative right to read to the jury the undenied allegation in its new matter: Fidelity & Casualty Co. v. Gizynski, 93 Pa. Superior Ct. 152.

*A. Martin Graham,* of *Graham, Matthews & Jamison,* for appellee.—Lower court placed proper construction on contract: Pitts. & West End Ry. v. Bridge Co., 165 Pa. 37; Howe v. Crawford Co., 47 Pa. 361; Cunningham v. Church, 159 Pa. 620; P. & L. E. v. Boro., 287 Pa. 311; Bole v. Ins. Co., 159 Pa. 53; White v. Smith, 33 Pa. 186.

The lower court did not err in permitting appellee to amend pleadings at the trial: Fredericks v. Coal Co., 148 Pa. 317; Erie City Iron Works v. Barber, 118 Pa. 6; Phila. v. Christman, 6 Pa. Superior Ct. 29; Wright v. Copper Co., 206 Pa. 274.

OPINION BY MR. JUSTICE WALLING, February 11, 1929:

In 1864, when the Erie & Pittsburgh Railroad, now operated by the plaintiff, Pennsylvania Railroad Company, was constructed through what is now the city of New Castle, it constructed an overhead bridge for a township highway known as Covert Mill Road, now West Washington Street. In 1895 the New Castle Electric Street Railway Company, the defendant's predecessor, constructed and thereafter used a double track street railway upon this bridge. In 1904 plaintiff's predecessor rebuilt the bridge at its own expense, as it had the former. During the same year, the electric railway company arranged with certain suburban trolley companies for the use of its track on West Washington Street and upon this bridge in gaining entrance to the city, the latter having granted franchises for this purpose. To prevent such additional, and as it contended, unauthorized use of the bridge, plaintiff's predecessor filed a bill in equity against the trolley companies and secured a preliminary injunction restraining them from making such use of the bridge, contending that the heavier suburban cars would injure and might destroy it.

Pending this bill, and to amicably adjust the controversy, the predecessors of the parties hereto, on December 27, 1904, entered into a written agreement, inter alia, as follows: 2. "The second party [de-

fendant herein] and the successors, lessees, licensees and assigns thereof may at all times hereafter without let or hindrance of the first part [plaintiff herein], maintain street railway tracks upon and across said bridge and operate thereon and thereover street railway and interurban cars.

3. "At all times hereafter the two parties hereto will maintain, repair and renew the superstructure of said bridge at their equal joint cost and expense, after first deducting therefrom any sum or sums contributed thereto by the City of New Castle, the County of Lawrence, Pa., or any other party or parties foreign to this agreement whom the parties hereto may by agreement permit or induce to share in said maintenance and renewal. The first party will perform the actual work of maintaining, repairing and renewing said superstructure and the second party upon receiving a statement of the cost of any such maintenance, repairing and renewal, less deductions aforesaid if such there be, will pay to the first party one-half of such cost and expense; it being understood that it is the intent of the word 'superstructure' as used in this agreement, to include all parts and appurtenances of said bridge exclusive of abutments; except that it is mutually understood and agreed that the second party will at its own cost and expense, maintain and renew all such rails, fixtures and appliances as are placed in or upon the superstructure of said bridge for the transportation of its cars, or those of its successors, lessees, assigns and licensees, upon and over said bridge......

"It is expressly agreed that if at any time hereafter the second party, its successors, lessees, licensees or assigns, shall operate upon and across said bridge interurban cars so much heavier than the one now operated upon the lines of the Sharon & New Castle Street Railway Company, or the lines of the New Castle & Lowell Railway Company, as to require that the said bridge be rebuilt or strengthened, the first party shall have the

right to rebuild or strengthen the same in such way as may be necessary and proper, and so much of the cost of such work as is made necessary solely by the increased weight of such cars, the second party will pay to the first party promptly on bill rendered." Pursuant to this agreement the bill in equity was withdrawn and the suburban lines entered upon and have since used the bridge.

In 1923, certain citizens and taxpayers of the City of New Castle made complaint to the Public Service Commission that the bridge had become unsafe, was a nuisance and should be replaced with a new one. An investigation satisfied the commission of the truth of the complaint and it decreed accordingly. Plaintiff submitted various plans, one of which was satisfactory to it and the defendant but the commission ordered the bridge rebuilt on a plan somewhat more expensive. The order of the commission directed plaintiff to reconstruct the bridge, ordered the city to enlarge the approaches, the defendant to take up and relay its tracks, etc., and ordered Lawrence Co. to pay plaintiff $5,000 and to pay the City of New Castle $7,000, all of which was done.

The new bridge was of the same length and width as the old, but built, as by order of the commission, at a greater elevation, on a different plan and somewhat more expensive. Extending parallel with and in the center of the cartway of the old bridge was a girder some four feet high, which was omitted from the new bridge, besides other changes.

The construction of the new bridge cost the plaintiff $37,907.58; deducting the $5,000 paid by Lawrence County, left the net cost $32,907.58. To recover one-half of which, namely, $16,453.79, this suit was brought. The jury found for the plaintiff for the face of the claim, with interest, and from judgment entered thereon defendant has appealed.

The record discloses no reversible error. The Public Service Commission statute did not avoid, or empower

the commission to avoid such a contract (see Pbg. & Lake Erie R. R. v. McKees R. Boro., 287 Pa. 311, nor did it attempt to do so here. Contracts which the commission can annul are only such as affect the public and fall within the police power of the Commonwealth, like transportation privileges, special rates granted by public service companies, etc. See Leiper v. Balt. & P. R. R. Co. et al., 262 Pa. 328; Swarthmore Borough v. Pub. Ser. Com., 277 Pa. 472; Beetem et al. v. Carlisle Light, H. & P. Co., 273 Pa. 82; Suburban Water Co. v. Oakmont Boro., 268 Pa. 243; Edgewood Boro. v. Pub. Ser. Com., 75 Pa. Superior Ct. 280.

The main controversy here is whether the contract embraced the rebuilding of the bridge in question. As to that, we have no doubt. The language, "At all times hereafter the two parties hereto will maintain, repair and renew the superstructure of said bridge at their equal joint cost and expense," is sufficiently broad to include a rebuilding of the bridge. Each word is presumed to have some meaning, and "to renew" naturally means to make new again, while to repair is to mend. That the contract was made perpetual supports this construction. It must have been in contemplation of the parties that in time the bridge, exposed to wear, strain and the elements, would give out and require replacement. In other words, that it must be renewed, and for that the contract provides. It is not a controlling difference whether it is done in sections or all at one time. The contract places upon the plaintiff the duty of making the renewal and upon the defendant the duty of paying one-half of the net expense. True, the Public Service Commission was not then in contemplation, but it was in contemplation that the bridge should be kept up in a lawful manner and as that is now a matter for the commission, since its action, as above stated, cannot destroy the contract, neither can it relieve either party from obligations thereunder. The defendant cannot escape its liability because of the lawful act of the com-

mission in directing the manner of rebuilding the bridge nor because the plaintiff complied with such direction, as legally bound to do. That the rebuilding was necessary is unquestioned. The new bridge performs the same function as the old was intended to do, in that it carries the traffic, including suburban cars, auto trucks, etc. The character of the traffic thereon has not substantially changed while its amount has greatly increased. The bridge as rebuilt was not such a departure from that of 1904 as to be an independent structure, nor does it appear that it was built to accommodate other traffic than that then in contemplation of the parties. Mere alterations of plans made necessary to comply with new regulations will not avoid a contract. For example, "A contractor under a building contract may recover from the owner for extra work not agreed to in writing but required by changes in the original plans, ordered by the building inspectors, although the contract provided that no extra work should be paid for unless agreed to in writing and signed by the parties": Cunningham v. Fourth Baptist Church, 159 Pa. 620.

There is, however, authority for the contention that defendant was only required to share in the upkeep of such a structure as was in contemplation of the parties when the contract was made (see Nether Providence Tp. v. Phila. Rapid T. Co., 280 Pa. 74; Ardesco Oil Co. v. Richardson, 63 Pa. 162); at most, under the facts of this case, that would only be a defense pro tanto and there is no proof as to how much more the structure cost as rebuilt than it would if rebuilt on the plan of 1904. Furthermore, that question is not raised by any assignment of error and therefore is not before us for review.

Clause 4 of the contract provides that, "Neither party to this agreement will, in order to force upon the City of New Castle, the County of Lawrence, Pennsylvania, or other party or parties foreign to this agreement, the payment of any part of the cost or expense of the main-

tenance and renewal of the superstructure of said bridge, do anything except with the consent of the other party." And defendant's answer sets up as new matter, in substance, that plaintiff, without defendant's consent, had caused the above stated complaint to be made to the Public Service Commission. By some oversight, plaintiff's counsel failed to file a reply to this new matter before trial but was granted leave to do so while defendant was submitting its testimony. The latter objected to this amendment of the pleadings, but declined the offer of the trial judge to continue the case. The practice Act of May 14, 1915, P. L. 483, does not deprive a trial court of the right to allow amendments, while it expressly gives such court the discretionary power of extending the time for filing any pleading (section 22, page 487) and that is practically what was done here. It was a matter primarily for the discretion of the trial court, which does not appear to have been improperly exercised. Had the request for permission to file plaintiff's reply been refused a nonsuit could have been taken and a new action brought. We do not say a refusal of plaintiff's request for leave to file the reply, so tardily asked, would have been error, but rather that it was a matter within the discretion of the trial court. Filing the reply introduced no new cause of action; it simply put that feature of the case at issue for trial upon its merits. Treating it as an amendment, it might be allowed at any stage of the proceedings. See Theisen v. Pittsburgh Rys. Co., 256 Pa. 475; also Fredericks v. Penna. Canal Co., 148 Pa. 317. Under the charge of the trial judge, the verdict implies a finding that plaintiff did not instigate the proceedings before the Public Service Commission.

The adjustment of controverted questions and the settlement of pending litigation afforded ample consideration for the contract of 1904, and it is our duty to construe it, not to determine what the rights of the parties were prior to its execution. A party cannot

avoid his contract because it may become burdensome. See Commercial C. H. Co. v. Big Bend C. M. Co., 293 Pa. 39; Swarthmore Boro. v. Phila. Rapid T. Co., 280 Pa. 79; Gross v. Exeter Machine Works, Inc., 277 Pa. 363; Corona C. & C. Co. v. Dickinson et al., 261 Pa. 589. As to this, we adopt the language of the trial court that, "It was urged on the argument that the defendant company was paying more than its share, considering all the use it made of this bridge and the expense placed upon it in the reconstruction of its tracks, but that was a matter to be considered by it at the time it entered into this contract. It wanted the right to perpetually maintain its tracks on this bridge [and to share its use with the suburban companies]. In order to secure that right it agreed to perpetually maintain, repair and renew the superstructure [that is, it agreed to share the expense thereof]. We think it should not be relieved of the obligation."

We find nothing doubtful in this contract but if doubtful it should be so construed as to make effective the covenants of the respective parties. For example, that of the defendant to share in the upkeep of the bridge. See Stetler v. North Branch T. Co., 258 Pa. 299. In other words, a contract is to be taken most strongly against the party on whom the obligation rests: 6 R. C. L., p. 854.

No other complaint seems to require special mention and the judgment is affirmed.